And Mr. Iworski, you accepted this case on appointment of the court? Yes, ma'am. And the court thanks you for your service to your client and the court. Thank you. We'll move to our third case this morning, which is Bishop v. Air Line Pilots Association. Case number 17-1438. Mr. Zolna, whenever you're ready. Thank you. Good morning. May it please the court. My name is J.C. Zolna. I represent a group of United Pilot instructors who are the appellants in this matter. There are a lot of complicated aspects of this lawsuit, but there are a few things that are crystal clear. First, the purpose of retro-pay is to compensate employees for working at under-market rates while a new contract is being negotiated. Second, that is not what happened here. ALPA excluded the largest pay gain for purposes of calculating the pilot instructor's retro-pay and replaced it with the same pay provision from a bankruptcy contract from a decade earlier. Third, ALPA knew exactly what it was doing. The ramifications of excluding that pay provision were explained to the subcommittee that was tasked with allocating the retro-pay, and they were warned of the gross inequities that would result if they went that route. But they did it anyways, and then they lied about why they did so. Lastly, numbers don't lie. As a result of this decision, the line pilots, who make up the majority of the union, recovered 38% of their lost retro-pay wages, whereas our clients, the pilot instructors, a minority group of the union, recovered only 15% of their retro-pay losses. That in no way reflects the proportionate harm suffered by our clients as a result of the three-year delay in negotiating this new contract. How do you calculate the 38% and the 15%? The 38% and the 15% were based on what each group would have received had the contract been entered into as of the amendable date. Did the 2012, the new contract, have the kinds of detailed rate schedules in it that are part of Letter Agreement 24 for the years 2009 through 2012? The 2012 agreement did not have pay rates for those years. They had pay rates starting as of the date the contract was signed. So what's your baseline for figuring 38% and 15%? That's just premised on, had the contract, that's premised on what I call the traditional way of calculating retro-pay. That is, take what someone would have earned had the contract been entered into timely, less what they actually earned under the old contract. How do you figure that out if the new contract doesn't have, in essence, retroactive schedules? It's just, for the pilot instructors at least, it takes into account the pay increase to their structure, and for everyone it takes into account just the commensurate increase in their hourly pay rate. Do you just extrapolate backwards? Because you've got inflation factors in all these rates from year to year, right? That's true, and ultimately it all ends up being equal anyways because these rates, you're right, maybe these rates in the 2012 rate, which would be the first rate in the new contract, maybe that wouldn't have been the actual rate in 2010 when the contract became amendable, but that's true for both the pilot instructors and the line pilots. Right, but let me just raise my broader concern here is, in essence, you seem to be taking the approach while denying it that there is one right way to do this. And I don't know what the baseline is for calculating the fairness issues here in a zero-sum game. Yeah, well there isn't one way. I could spend my entire 15 minutes coming up with all sorts of different ways of how this could have happened and we wouldn't be here today. But really the crux of it is, and sure the numbers are one thing, that just provides context to what happened here, but what really happened is that there was the largest component of the pilot instructor's pay was simply excluded and they used a bankruptcy contract from 10 years earlier. And the point being is that, okay, we used the Delta contract, right, for the hourly rates to calculate retro pay and ELPA insists that that's fair and equal because we use hourly rates for everyone. Well, using their stated purpose for using that contract proves the inequities because their stated purpose for using the Delta hourly rates was they wanted to use the industry-leading benchmark during those years. What were other pilots in these positions being paid during those years? Okay, fair enough. They did that for the line pilots, but they didn't do it for the pilot instructors because they didn't use the pay structure applicable to pilot instructors under the Delta contract. They replaced that. They took that out and they replaced it with the same pay structure under the bankruptcy contract. So while the line pilots, their retro pay was calculated based on a market rate comparator during those three years, the pilot instructors were not. Their retro pay was not based on either the new contract nor a market rate comparator. Was there no comparison to the Delta contract in the pilot instructors' calculation? No, they did not use, they specifically included a provision in the letter agreement saying we are going, for the pay formula for pilot instructors, we're not going to use the pay formula in the Delta contract. We are going to use the pay formula set forth in the 2003 bankruptcy contract. So there was no reference to the Delta contract in the pilot instructors' formulation? They were paid a Delta hourly rate under a pay formula from the 2003 bankruptcy contract. So that's where what I call the fallacy that ELPA has pushed in this lawsuit that everyone is treated equally because they keep pointing to the fact that all we did was we used the hourly rates in the Delta contract for everyone. But that ignores the fact that pilot instructors are not hourly employees. A few moments ago you talked about you figuring out the appropriate pay, back pay, taking the 2012 contract as the baseline, working backward as the traditional way of doing it. Is there anything in the record that says that's the traditional way of doing it? Well, I've cited the definitions of, you know, in the record, there's definitions of what retro pay is. And I cited a handful of them from a variety of different sources in our briefs stating exactly what that is. And it's exactly what I said it was. Now, I'm not necessarily faulting them for doing it differently. The fact that they used the Delta contract as a market rate comparator in and of itself is not our complaint. The problem is they didn't use it consistently. They didn't take the Delta contract and say, okay, this is what pilot instructors were being paid at Delta for this three-year period of time and that's what we're going to look at. They did not do that. They did that for the line pilots. But for the pilot instructors, they said, we're not going to use this pay structure. Even though that was the market rate, according to ALPA, during this three-year period of time, we're going to replace that with a pay provision from a bankruptcy contract from a decade earlier. Please, go ahead. I just was wondering, refresh my recollection, how was this, this was decided in what procedure or posture? This was a judgment on the pleadings. It's essentially a failure to state a claim. We couldn't even get our foot in the courtroom door. So even though you did suggest that this was, at least not the traditional way of doing things, and suggested there might be an ulterior motive, i.e. it was much better for ALPA to favor the guys with all the votes than the guys without the votes, you didn't get past Rule 12? Correct. What was missing specifically for the pilot instructors in the retroactive adjustment? It looks like for any month during the RPP, an EP is a pilot instructor. The delta differential is determined using the hourly rate for a 767, 757 first officer with six-year longevity, and his RP hours will equal 89. Correct. How is that different from delta? Delta was much higher than that. Again, these pilot instructors, these aren't... In terms of the seat and the feet? Yes, yes. Drastically higher. What about the hours? The hours, I do not recall in front of me, as I could provide the court with that. Maybe when I sit down, I can look through. But in general, the overall pay structure for delta pilots was significantly higher. And remember, these guys aren't newbies. Pilot instructors, they train... These are guys who train the people who fly us from point A to point B, so they're all more experienced guys. They're at least 12 years or more senior. Yet the new contract just uses a nine-year seniority. Right. So I confess, as an outsider, I was a little surprised. I would have thought the pilot instructors would be among the very highest paid. Correct. Well, the thing is, ultimately, whether it's nine years or six years or a 757 range or a first officer or captain, all this was, it was just simply an XYZ calculation to come to a monthly sum to pay these people. They could have used any other... They could have said eight years but increased the aircraft or turned them into captains instead of first officers. So what are the stakes here? The union has told us, has described the stakes as infinitesimal for line pilots. What are the stakes for your clients, and what remedy do you want? The stakes for our clients are quite large. I mean, I think we haven't had an opportunity to get to discovery to create a damage model, but most of these people should have been stood in line to get tens of thousands, if not substantially more per class member in retro pay than what they did. I think we ran some numbers for some of these class members based on the limited information we had, and there might have been discrepancies in the range of $50,000 or more. So that's a big chunk of money. If you equalize 38% and 15% and that's somewhere much closer to 38% because of the numbers, how much money is it for the group would need to move? To answer that question, the overall amount of retro pay payment, the 225 that they ultimately got, represented about a third of the total losses for the entire group of pilots, all job categories. There are two groups that we represent in this case. We succeeded in the other one. We're here on the second one. Between what I call the manipulation of those two groups, they were able to increase the line pilot share up to about 38%. Which decreased the pilot instructors down to 15%, obviously they're a smaller group, so a bigger chunk out of their share results in a commensurate smaller bump, but collectively, this is millions of dollars. Okay, sufficiently vague. Could you address the union's point that the pilot instructors got the biggest increase in the new 2012 contract and aren't they allowed to take that into account in adjusting distributional fairness within the union? They should, Your Honor. I think both ELPA's logic and the district court's logic on that issue is looking at it backwards. I understand. It's true. The fact that they received the largest pay raise, all that means is that they were furthest under market rate out of any other group during that three-year period of time. Every day that went by during that three-year period of time, they were harmed the most because they were denied that significant pay increase. So it's backwards to look at that by saying they should just be happy that they got the largest pay increase, which they should be saying is they were harmed the most for this delay. Your point is that the pay increase had nothing to do with retroactive pay. It's prospective entirely, right? Well, the pay increase has... I understand your point, but it does have bearing on retro pay because that's how much someone was harmed. These guys got clipped the worst in the bankruptcy. They were working under depressed wages for a long, long period of time. They stood in line the most to gain by this new contract. So the fact that they did ultimately receive the largest pay increase doesn't mean that they should be punished in terms of the retro pay. Your point is the formula that is used ought to reflect their pay forward and rectification of the problem. But you're not arguing and you're not admitting that their pay forward from 2012 has some kind of a component built in it to give them back pay. No. It should be looked at as how much were they harmed by this delay and the fact that they were working the furthest under market value cuts in our favor. Here's the problem. Maybe you can help me with this. It's hard for me to see that there is one correct baseline. Whether it's the bankruptcy contract, whether it's the contract before the bankruptcy, the 2012 contract, the Delta contract, and when a union is facing these sorts of intramural zero-sum distributional decisions. I'm concerned that if we say this should go to trial, we're going to be second guessing union distributional decisions without limit. Well, there's two things that will alleviate that concern. The first is that this wasn't something where they took into consideration their increased pay formula and they maybe did halfway or a third or some other formula that didn't quite account for the entire increase. That's not the case. They just didn't consider it all together and they refused to consider it. It was dead on arrival. The local chairman for pilot instructors sat on that subcommittee and he warned ELPA. He warned them that this pay cap was important and they said, we don't care, we're not going to consider it at all. They just didn't consider it at all. So the fact that they didn't consider it at all and then the fact that they lied about it on the back end to me differentiates this case than the myriad of other decisions that could have been made but weren't in this situation and I know I'm out of time. You are out of time. Thank you. Thank you. Mr. Abram. May it please the court. This case is a judgment on the pleadings as was Cunningham three years ago, a judgment supporting a dismissal of a complaint. Same standards applied and that is whether two plaintiffs have come forward with sufficient plausible statements in their complaint and anything else thereafter that would show that what the union did was either arbitrary, discriminatory or in bad faith and therefore hurt them. What was the situation in Cunningham, Mr. Abram? Your Honor, the situation in Cunningham was a decision about how much longevity to grant to pilots based upon the years of furlough that they had had and the dispute came about because the plaintiffs said that they were not given the full longevity in order to favor the continental pilots. So it was a similar kind of allocation claim and what the court said was that on its face that's not arbitrary and it is not plausible any more than it is here that the union was simply out to get a whole group of pilots in that process. First of all as the court said then and it applies here too the rules on discrimination apply to a prohibited characteristic. Being a flight instructor, a pilot instructor is not a prohibited characteristic as the courts call it or you might call it a That's a position through which pilots pass, they choose to go into it, they choose to stay in it and they come out of it. They are line pilots who fulfill that position for a period of time, some of them longer than others, just like a line pilot can fill a position as a 747 first officer or as a 727 captain. So, no longer 727 but a captain on another piece of equipment. So the it's not a race, it's not even a politically disfavored group. The whole point about the infinity Those are all areas where we use a strict scrutiny test and equal protection analysis. The question here is whether under the labor statute you treated somebody unfairly. That's right your honor but all of that has to be analyzed in light of the union's extremely broad discretion. And the reason it has a broad discretion is this discussion illustrates. Here's why I have my problem with your case and maybe you could help me Yes sir. You used a formula but you know you can use a formula and get a bad result. It's not a result that smells bad. You use H2SO4 is a good formula and it has a bad smell to it. Okay, here you used a formula that one was not a formula that was drawn from the 2012 contract but you were trying to make good on what had happened in those past years. Instead you used a formula that was known to be infirm. Secondly, according to the allegations of the complaint you favored the group that's got the votes for Alpha. So if you're a district judge, why do you boot this thing on Rule 12? Alright, Your Honor. First, the formula that was adopted which Mr. Zolna does not quarrel with, which was to use the Delta contract as the base. Why was the Delta contract used? Because that was the rates of pay in effect during the retro period and there had been a tremendous movement in pilot pay from 2010 to 2012 so there's no way to say what those rates would have been under the United contract in 2010. This merger took place this was all in the context of the merger lots of things flowed from that in 2012 that made the situation extremely different from what was going on in 2010. Secondly, the Delta contract was what the union used to convince management and the National Mediation Board to provide this retro fund. It was less than what the union hoped to get but it's what they got. And that was provided if I may, that was provided in the 2012 contract. That's correct. The retro fund. That's correct. And thirdly, let's just focus on what, on this formula and why it in fact did not smell and why it was not arbitrary and it wasn't discriminatory and I'll talk about this bad faith claim in just a minute. It chose for all pilots one parameter from the Delta contract which was the rate of pay applicable to the positions that they occupied under the United contract during the relevant period. Yes, they could have with respect to the Delta, with respect to the United instructors said, well we're also going to boost that up for longevity. They could have done that. That would not have been improper. Had they done that for the Delta, excuse me, for the United flight instructors however, used Delta longevity, then what about longevity changes that were made in 2012 for anybody else if they changed the longevity? They didn't do that. There were pilots as we know from Cunningham whose longevity was adjusted in 2012 in that contract. That adjustment was not recognized in this new contract. There were differences in the ways in which rates of pay were raised under the United agreement compared to the Delta agreement. Some pilots did better using the differential under the Delta contract than they would have done if you'd used the United pilots rates. Again, nobody got any special preferential treatment in that respect. Seniority was adjusted in the 2012 agreement as a result of the merger. There was new seniority lists. None of that was taken into account. People flew different hours under the United pilot agreement than they would have flown under the Delta agreement had that been in effect. In fact, because of the pay raises in the 2012 agreement, some pilots would have flown a lot more under that agreement than they did fly under the much reduced rates that everybody was under in 2012, 2010, 11, and 12 when everybody was flying under a 2003 bankruptcy agreement. Everybody. None of that was taken into account. Now, yes, the union could have done all of these different things. Just like they could change different rates of pay for captains and co-pilots, they could have more vacation, they could have more retirement. There are a thousand decisions that go into a collective bargaining agreement, at least a thousand. They're constant decisions that you have to make that the union is charged with the responsibility of making. People select a union and charge them with the responsibility. It is not governed by the same rules as the equal protection clause in the sense of saying that because something bad happened to you, therefore you automatically get to go to court. Every agreement has in it dozens of decisions that somebody could say, that was bad, I didn't like it, that hurt me, I should have done better. And there's a political process for doing that. This process was used here. The pilot instructor representative on the MEC, according to the what was said when, but just taking their allegation, he made this argument to the committee and they said, no, we don't agree with you. And in the record, in their own filings, is the statement from that individual, the chairman of the committee, who said excuse me, a statement from their own individual, Mr. Cassiano, who said that was done according to the union because it was simple. And it was simple. But more than being simple, it avoided all the disputes that could have been here today from somebody else that Mr. Zolno perhaps wasn't going to be representing, who said you did something that I didn't like and we could have been here for that purpose as well. All of these things, Your Honors, are, that's why the duty of representation is necessarily extremely broad in giving discretion to the union. And that's why it's appropriate, as this court has repeatedly observed, to grant judgment of dismissal or on the pleadings unless the plaintiff comes forward with showing something that was patently arbitrary, discriminatory in the sense of going after a protected group. And here, what or bad faith meaning, not only did I allegedly lie to you, but I allegedly lied to you in such a way that induced you to take action that you relied on. If I put out a statement saying, I'm going to file a grievance for you and I didn't intend to do it and I don't do it, if I put out a statement in a contract ratification that says, well, you're going to be getting an $80 pay increase, but instead you're only getting $60 and you vote for it on that basis, that's what's meant by bad faith. The alleged lies here, and we dispute this quite strongly, the motion for judgment on the pleading, assuming the plaintiff's claim is correct, that in April of 2013, four months after the contract was ratified and six to eight months after this letter of agreement was worked on and reached, the chairman of the subcommittee said to an arbitrator that Mr. Arellano supported this outcome and Mr. Cassiano came into that same arbitration and said, Mr. Arellano told me that he did not support it and here's his email to show that. And that's the same email that the plaintiffs have relied on here. That had nothing to do with the ratification vote. It had nothing to do with the MEC's decision making. It was in an arbitration that took place months later and it does not show anybody relying on anything that would affect the outcome of this case. So, if I may, just to sum it up, if you don't have an allegation that shows that something is arbitrary, you can't show that it's discriminatory because it's not a protected group. And by the way, this infinitesimal point, it's not that the union intentionally said, well because you're getting a big raise you don't get this much money. The point of it is that it shows that the union was not hostile to the instructors. That's why we made that point and that's what the court below basically said. How could you say the union was hostile to the instructors when they got the biggest raise of all and the fact that Mr. Arellano was part of that negotiation doesn't mean that it wasn't the biggest raise or that the union didn't support it. It did. And thirdly, the amount of money that may be more for these individuals, of whom there's a total of 130, that amount of money each one of them may have gotten might be significant to them, but on the whole it doesn't matter very much at all to the 6,000 line pilots. It's infinitesimal, as the plaintiffs have said in their own papers. Could you address the 38% versus 15% calculation and what are the overall stakes here? Okay, the overall stakes here are, as I understand it, about, I think am I right in thinking it's two to three million dollars is the maximum amount of maybe a little bit more. A little bit more. Within that range, the single digits, total amount of damages that they would have. But that's on the basis of 38% to 15% calculation. That, there is no basis. There is no traditional retro way. There is no one way of doing retro. Black's Law Dictionary may call retro something, but we're talking about collective bargaining involving three years of enormous changes. The union is not bound to follow Black's Law Dictionary. It's the union. They're bound to come up with something that makes sense for them and the members. And 38% is based upon what would have happened if you had applied two year work during the 2010 to 2012 period the opening rate of pay in December 2012 of the United Pilot Agreement. Not a rate that was in effect anywhere during that three year period of time. And the 15% is based upon the same proposition for the flight instructors, the pilot instructors who did not get that same, I'm not disagreeing, they didn't get that same percentage, whatever it would be, whatever the correct amount was. Because the formula said, we're going to apply to what you did and the job you had at Delta, a job at United Airlines, we'll apply the same formula to everybody of taking that Delta hourly rate and that's the only difference we're going to look at. And that's why you get to a difference like that if you're retrojecting back from 2012 to 2010, which neither the law nor common sense would dictate. Thank you, your honors. Thank you. Mr. Zolno, your time had expired, but you can have two minutes for rebuttal. We kept you at the podium with questions. Thank you, your honors. I'll just address two points raised by Mr. Abram. One is the service provisions. Mr. Abram mentioned a bunch of service provisions that increased longevity for certain people, etc. That's a red herring because all those same service provisions, you have to distinguish those from the actual pay provisions. And here those service provisions were applied equally to everyone. Line pilots and pilot instructors alike. So if someone's longevity may have increased because of these service provisions, that would have applied equally to both the line pilots and the pilot instructors. We're not talking about those provisions. We're talking about a pay formula. A pay formula for the pilot instructors. That's different than service requirements. And those pay formulas, the seat, fleet, and longevity combination and the hours are completely untethered to reality. They have nothing to do with someone's actual seat, fleet, and longevity, how many hours someone works. It's just an XYZ formula to get to a sum of money to pay these people a monthly rate. And they move those up and down to give those people pay raises. It's plain and simple as that. The other thing is Mr. Arellano and Captain Fox, that kind of clucked the dialogue at the arbitration. This wasn't just us saying he supported it and no, he didn't really support it. That's the big lie here. The big lie here is that they lied about the decision-making process itself when Captain Fox was asked, why did you do this when you knew it was going to harm us so much? He played dumb. I'm not a pilot instructor. We relied heavily on Mr. Arellano who is. And we accepted his advice. He told us this would be fair and the way to go. That's a lie. He lied. People don't lie for no reason. They lie to cover up for something that they knew was wrong and they knew it was wrong because Mr. Arellano told them that this would result in a gross inequity. So in this case, when you're looking at a duty of fair representation, whether something was arbitrary or in bad faith, you need to look at the results of the decision and the why it was done that way. The results patently skewed allocation. No dispute there. And the why? Well, we don't really know yet, but we do know that the reason Alpert proffered was a lie. So the result stinks, the why stinks, and all we're trying to do is get our foot in the courtroom door on a motion for judgment on the pleadings. And I think at this stage, we've done more than enough to try to prove our case. Thank you. All right. Thank you. Our thanks to both counsel. The case is taken under advisement.